



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 13, 2021**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Vantage Benefits Administrators, Inc.,** | § | **Case No. 18-31351-sgj7** |
| | § | |
| Debtor. | § | **Chapter 7** |
| ——————————————————— | § | |
| | § | |
| **Evanston Insurance Company, an Illinois** | § | |
| **Corporation,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | **Adv. Proc. No. 19-03141-sgj** |
| | § | |
| **Vantage Benefits Administrators, Inc.,** *et* | § | |
| *al.*, | § | |
| | § | |
| Defendant | § | |

**REPORT AND RECOMMENDATION TO DISTRICT COURT
PROPOSING THAT IT: (1) GRANT SUMMARY JUDGMENT IN FAVOR OF EACH
OF THE INSURANCE CARRIERS ON COVERAGE ISSUES; AND (2) DENY
CHAPTER 7 TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON SAME COVERAGE ISSUES**

I.    Introduction

      The above-referenced action is all about whether there is professional liability insurance coverage for losses suffered by an entity known as Vantage Benefits Administrators, Inc. ("Vantage") and its creditors.  Vantage is now a Chapter 7 Debtor, and it acts through a Chapter 7 Trustee, Jeffrey Mims (the "Bankruptcy Trustee").

      Pending before the court are four motions for summary judgment: (1) one by the primary insurance carrier Evanston Insurance Company ("Evanston");[1] (2) another by an excess carrier, Certain Underwriters at Lloyd's, London and HDI Global Specialty, SE (collectively "Lloyd's");[2] (3) another by an additional excess carrier, Landmark American Insurance Company ("Landmark");[3] and (4) one by the Bankruptcy Trustee.[4]  All address whether there is any genuine dispute of material fact regarding the existence of insurance coverage for certain losses that are further described below.  The bankruptcy court believes that there is no genuine dispute as to any material fact and that there is no insurance coverage for Vantage and its creditors, as a matter of law, for two reasons.  First, the fortuity doctrine appears to preclude coverage because the insureds (*i.e.,* Vantage and its principals) had knowledge of the acts that gave rise to the losses before they applied for the policies.  Second, the policies' insuring agreements and exclusions appear to preclude coverage, in that the acts that gave rise to the losses/claim were committed intentionally and knowingly.  Therefore, as further set forth below, the bankruptcy court recommends that the

---

[1] DE ## 75 & 76.
[2] DE ## 94 & 99.
[3] DE ## 97 & 100.
[4] DE ## 67, 68, 73 & 74.

District Court grant summary judgment in favor of the insurers on the coverage issue and deny the Trustee's motion for summary judgment on the same issues.

II.    <u>Background</u>

The above-referenced action started as a Complaint for Rescission and Declaratory Relief filed on February 27, 2018, in the United States District Court for the Northern District of Texas, by Evanston against Vantage and Jeffrey and Wendy Richie (the "Richies"). Vantage was a third-party administrator for various employee benefit plans, such as 401(k) plans.  The Richies were the owners and principal officers of Vantage.  Shortly before filing this action, Evanston learned that the Richies had been accused of misappropriating millions of dollars from various 401(k) plans under Vantage's administration as part of an intentional scheme. In fact, there were news stories describing an FBI raid of Vantage's offices.  Certain parties that had suffered losses due to this alleged misappropriation of assets began making demands and filing lawsuits—hoping that their losses would be covered by insurance. Apparently, to hide their theft of 401(k) plan assets, the Richies issued false account statements and audit reports that misrepresented the value of the plans and the accounts from which they stole. The Richies were later indicted, pleaded guilty, and are now in federal prison relating to their acts at Vantage.  It is undisputed that the Richies' scheme of embezzlement was ongoing when Ms. Richie (who had knowledge of the scheme, as she was participating in it) signed the Application for the Primary Policy (the "Application") and took other actions to initiate insurance coverage.

A few weeks after Evanston filed this action, certain creditors forced Vantage into an involuntary Chapter 7 bankruptcy case.  The Bankruptcy Trustee then stepped into the shoes of

Vantage in this action. The Bankruptcy Trustee soon added as third-party defendants in this action the excess carriers, Lloyd's and Landmark, as well as an insurance agent.[5]

By way of further background, in October of 2017, Evanston issued to Vantage and the Richies (the "Insureds") a Specified Professions Professional Liability Insurance Policy, No. EO869083 (the "Primary Policy") on a "claims-made" basis for the Policy Period of October 15, 2017 to October 15, 2018. The Primary Policy provided a claim limit of liability of $3,000,000 per claim and a $3,000,000 aggregate limit of liability, subject to a $5,000 per claim deductible ($15,000 in the aggregate). Its "Retroactive Date" was October 15, 2015, as set forth in Item 5.A. of the Declarations. Vantage also obtained excess coverage of $5,000,000 from Lloyd's and $2,000,000 from Landmark (the "Excess Policies"). The Excess Policies "followed form" to provide coverage in the same circumstances as those covered by the Primary Policy. The Primary Policy and the Excess Policies will be collectively referred to as the "Policies." Shockingly, Vantage's headquarters was raided by the FBI on October 25, 2017—a mere 10 days after the alleged effective date of these Policies—and it was immediately thereafter that their bad acts began to be apparent.

In Evanston's Motion for Summary Judgment (the "Evanston MSJ"), Evanston asks the court to determine that there is no genuine dispute of material fact and to rule, as a matter of law, on various issues as to the Primary Policy: (1) first, that it was properly canceled for nonpayment of the initial premium (and therefore provided no coverage for any matter whatsoever); (2) alternatively, that it was properly rescinded on the basis of a materially false Application (and

---

[5] The insurance agent, Hatter, Williams, & Purdy Insurance Marketing, Inc. ("HWP"), is not the subject of any of the motions for summary judgment pending before the court. Rather, the Bankruptcy Trustee asserted certain claims against HWP, in the alternative, in the event that he did not prevail on the coverage issues addressed in the motions for summary judgment. Additionally, the Richies are not participants in this summary judgment litigation, as they have never appeared in this action (perhaps this is not surprising since they are in prison).

therefore provided no coverage for any matter whatsoever); and/or (3) even if not canceled or rescinded, the Primary Policy does not provide any coverage for the claims of the Bankruptcy Trustee and other Vantage creditors that arose out of the Richies' years-long multimillion-dollar embezzlement scheme.

The Bankruptcy Trustee, meanwhile, brought his own motion for partial summary judgment (the "Trustee MSJ")—expanding the issues to include the Excess Policies. The Bankruptcy Trustee, through the Trustee MSJ, asks the court to construe each of the Policies' coverage provisions and declare that the Policies, in fact, covered intentional actions and breaches of fiduciary duties under the Employment Retirement Income Security Act of 1974 ("ERISA").

The excess coverage providers next waded in with their own motions for summary judgment in response to the Trustee MSJ. First, Lloyd's filed a Response and Motion for Partial Summary Judgment on the Trustee's request for declaratory relief (Count I of Trustee's First Amended Third-Party Complaint) and the Trustee's breach of contract claim against Lloyd's (Count II).[6] Second, Landmark filed a Response and Cross-Motion for Partial Summary Judgment on ERISA and Policy-based claims.[7] (Collectively, the "Excess Policies MSJs"). These Excess Policies MSJs largely echo the arguments of Evanston on the coverage issues.

Upon studying the Evanston MSJ in particular, the bankruptcy court determined that efficiency would be served if the issues presented therein were bifurcated, and the court first considered two gating issues. Those gating issues were: (a) whether the Primary Policy was rescinded as a matter of law, based on undisputed facts; and/or (b) whether the Primary Policy was canceled as a matter of law, based on undisputed facts. On April 6, 2021, the bankruptcy court

---

[6] DE # 99.
[7] DE # 100.

entered an Order denying summary judgment on these two gating issues.[8] There seemed to be legal problems with these cancellation/rescission arguments such that summary judgment was not appropriate for Evanston on these issues. Thus, this Report and Recommendation addresses the remaining issues in Evanston's MSJ, as well as the Excess Policies MSJs, and the Trustee's MSJ. As set forth below, the bankruptcy court believes that summary judgment should be granted on the Evanston MSJ; granted on the Excess Policies MSJs; and denied on the Trustee MSJ. As later explained, this will dispose of most of this action—only the claims in this action against the insurance broker HWP will survive.

III.     Undisputed Material Facts

The Debtor, Vantage, was founded in or about 1997 and was a full-service third-party administrator specializing in corporate benefit programs.

The Richies co-owned and operated Vantage.[9] Mr. Richie was the President and Chief Executive Officer, and Ms. Richie was the Vice-President of Administration. She conducted Vantage's financial transactions.[10]

On December 16, 2016, an employee of Vantage discovered that Ms. Richie had stolen over $6 million from two retirement plans. The employee informed Mr. Richie, and later that same day, Ms. Richie admitted to Mr. Richie that she had stolen retirement funds.[11]

---

[8] DE # 139.

[9] *See* Lloyd's App. Ex. 9, pp. 238. Note: Lloyd's summary judgment evidence will be referred to as "Lloyd's App. Ex. __, pp. __." Lloyd's appendix appears at DE # 99. Evanston's summary judgment evidence will be referred to as "Pl. App. Ex. __, pp. __." Evanston's appendix appears at DE # 75. The Bankruptcy Trustee's summary judgment evidence will be referred to as "Defs. App. Ex. __, pp. __." The Bankruptcy Trustee's appendix appears at DE ## 111 and 112. Landmark's summary judgment evidence will be referred to as "Landmark App. Ex. __, pp. __." Landmark's appendix appears at DE # 98.

[10] *See Id.*

[11] *See* Landmark. App Ex. F, pp. 124

On October 10, 2017, Ms. Richie signed the application for the Primary Policy (the "Application") on behalf of Vantage.[12]  The Application required her to disclose known facts or circumstances that might give rise to a claim under the Primary Policy ("Question 2") and former or pending regulatory proceedings against Vantage or its principals ("Question 4").[13]  She disclosed no facts, circumstances, or actions.[14]  The Application contained an "Application Exclusion" that purported to allow Evanston to rescind the Primary Policy if the insureds made false statements in the Application.[15]

The Primary Policy purported to become effective on October 15, 2017.[16]  The Excess Policies purported to become effect on October 15, 2017, as well and "followed form" in all respects with the Primary Policy.

On October 25, 2017, the FBI raided Vantage's headquarters and detained the Richies under allegations of fraud and theft.[17]  The FBI issued a press release about the raid one week later on November 1, 2017.

On November 17, 2017, Evanston sent Vantage a formal letter which purported to deny coverage and stated, "due to the falsity of the Application, Evanston is contemplating rescission of the Policy, and should Evanston determine to rescind the Policy, it will provide adequate notice."[18]

---

[12] See Pl. App. Ex 16, pp. 231-239.
[13] See Pl. App. Ex 16, pp. 233.
[14] See Id.
[15] See Id. pp. 231-239.  See also Evanston's Brief in Support of its Motion for Summary Judgment, DE # 76 at 11.
[16] See Id. pp. 231-239.
[17] See The Bankruptcy Trustee's First Amended Answer, Counterclaims, and Third Party Complaint, DE # 49 at 6.
[18] See Defs. App. Ex. L, pp 78-87.

On February 28, 2018, Evanston provided Vantage a formal "notice of recission" to "notify [Vantage] that Evanston has determined to rescind the Policy, in its entirety, rendering it void ab initio as to all insureds."[19]

On March 7, 2018, Evanston sent Vantage's insurance agent, HWP, an endorsement to cancel the Primary Policy for nonpayment of the premium, effective October 15, 2017.[20]

On April 19, 2018, four creditors filed an involuntary bankruptcy petition against Vantage.

On March 23, 2020, the Richies signed plea agreements admitting to theft from the accounts Vantage administered.[21]

In Ms. Richie's Factual Resume for her guilty plea to theft from an employee benefit plan and aggravated identity theft, she agreed that "beginning from at least 2014, and continuing until October 2017, [she] engaged in a course of conduct of using the identifying information of plan beneficiaries to transmit false and fraudulent distribution requests to Matrix [the custodian of the plan funds] for disbursement of funds purportedly to a beneficiary's bank account, but was in fact [Vantage's] operating bank account . . . ."[22] During the time between "September 2014 and October 2017, [Ms. Richie] diverted approximately $15.2 million from 13 pension plan funds and 7 optional retirement plans all of which went into [Vantage's] operating account."[23]

Similarly, Mr. Richie pleaded guilty to theft from an employee benefit plan and aiding and abetting.[24] In the Factual Resume for Mr. Richie's guilty plea, Mr. Richie agreed that "[f]rom at least December 16, 2016 through October 24, 2017, [Mr. Richie had] actual knowledge of Wendy

---

[19] *See* Defs. App. Ex. M, pp. 88-89.
[20] *See* Pl. App. Ex. 17, pp. 238. *See also* Evanston's Brief in Support of its Motion for Summary Judgment, DE # 76 at 2. The endorsement itself provides only its purported effective date and not the date it was issued or sent. The court relies on representations by counsel for the endorsement's date of issuance and transmission to Vantage's insurance agent.
[21] *See* Pl. App. Ex. 30, pp. 308-322.
[22] *See* Landmark App. Ex. F, pp. 124.
[23] *See Id*. at pp. 124.
[24] *See Id*. at Ex. G, pp. 130.

Richie's criminal conduct, aided and abetted Wendy Richie's continuing thefts by intentionally failing to take any action to stop the fraudulent distributions or to notify the plans, their participants, or the funds custodian; and knowingly accepted the proceeds that benefitted both his company and himself personally."[25]  Mr. Richie further admitted that the proceeds from the thefts of the employee pension benefit plan funds committed between 2014 and 2017 were deposited into Vantage's operating accounts and personal accounts.[26]

IV.   Jurisdiction

Bankruptcy subject matter jurisdiction exists in this proceeding pursuant to 28 U.S.C. § 1334 because this adversary proceeding is related to a bankruptcy case.  The bankruptcy court has authority to adjudicate pretrial matters pursuant to 28 U.S.C. § 157, Miscellaneous Rule No. 33 for the Northern District of Texas, and the Order of District Judge Sam R. Cummings dated January 15, 2020, DE #33.  That Order directs that the District Court will withdraw this action when it is trial-ready, to be tried in the District Court, and the District Court will have final authority over any disposition of claims in pre-trial motions.

V.   Summary Judgment Standard

To succeed on summary judgment here, Evanston and the Excess Policies carriers must first establish that there is no genuine issue of material fact pertaining to the existence of coverage. "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."[27]  Disputes regarding material facts are genuine if a reasonable jury could return a verdict for the nonmoving party.[28]  In order to support or refute an assertion that a genuine issue of material fact exists, the

---

[25] *See Id*. at pp. 141-142.
[26] *See Id*. at 143.
[27] Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056 (incorporating the Rule 56 standard into adversary proceedings).
[28] *Anderson v. Liberty Lobby, Inc.*, 477 US. 242, 248 (1986).

parties must cite to particular parts of the record to demonstrate that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[29] The court views the facts and evidence in the light most favorable to the nonmoving party at all times.[30] The court has discretion to consider all evidence in the record, beyond simply the evidence attached to the summary-judgment motions.[31] Although all evidence in the record may be considered, the court refrains from making credibility determinations and weighing the evidence.[32] Yet, a party may nevertheless object that evidence cited in the record cannot be produced as admissible evidence.[33]

The evidentiary support necessary to meet the initial summary judgment burden depends on whether the moving party bears the ultimate burden of proof at trial.[34] If the moving party bears the burden of proof on an issue, they must present adequate evidence to entitle the moving party to judgment at trial.[35] If the movant establishes this evidence, the burden then shifts to the nonmovant to cite specific evidence demonstrating that a genuine issue of material fact exists.[36] The nonmovant must also articulate the manner in which that evidence supports that party's claim.[37] Even if the movant meets the initial burden, the motion should be granted only if the nonmovant cannot show a genuine dispute of material fact.[38]

## VI. Policy Interpretation Under Texas Law

---

[29] Fed. R. Civ. P. 56(c)(1).
[30] *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014).
[31] *See* Fed. R. Civ. P. 56(c)(3).
[32] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).
[33] Fed. R. Civ. P. 56(c)(2).
[34] *See In re Rotary Drilling Tools USA, LLC*, 2017 WL 4990440, at *2 (Bankr. S.D. Tex. Oct. 27, 2017).
[35] *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)).
[36] *Id.* (citing Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324).
[37] *Id.* (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).
[38] *Id.* (citing *Duffie v. U.S.*, 600 F.3d 362, 371 (5th Cir. 2010)).

"Interpretation of an insurance policy is a question of law."[39] Insurance policies are construed according to general rules of contract construction to ascertain the parties' intent.[40] The court looks first to the language of the policy and seeks to harmonize and give effect to all provisions so that none will be meaningless.[41] The policy's terms are given their ordinary and generally accepted meaning unless the policy shows the words were meant in a technical or different sense.[42]

Under Texas law, "the insured has the [initial] burden of establishing coverage under the terms of the policy."[43] Once the insured establishes coverage, the burden shifts to the insurer, who must prove the loss is within an exclusion to avoid liability.[44] If the insurer meets this burden, then the insured must demonstrate an exception to the exclusion to bring the claim back within the policy's coverage.[45]

Under a liability policy, an insurer's duty to indemnify is separate and distinct from the duty to defend.[46] The duty to indemnify is determined not by the allegations in the underlying suit, but by the underlying facts that result in the insured's liability.[47] Thus, the court may rely on more than the insurance policy. It may consider the evidence introduced by the parties during coverage litigation.[48]

VII. <u>Analysis</u>

    *a) The Fortuity Doctrine*

---

[39] *Guaranty Nat. Ins. Co. v. North River Ins. Co.*, 909 F.2d 133, 135 (5th Cir. 1990).
[40] *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008).
[41] *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010).
[42] *Id.*
[43] *Gilbert Texas Constr., LP v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) (citing *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 782 (Tex. 2008)).
[44] *Id.* (citing *Ulico Cas. Co.*, 262 S.W.3d at 782).
[45] *Id.*
[46] *Farmers Tex. County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997).
[47] *J.E.M. v. Fidelity and Cas. Co. of NY*, 928 S.W.2d 668, 673 (Tex.App.–Houston [1st Dist.] 1996, no writ) (citing *Cluett v. Medical Protective Co.*, 829 S.W.2d 822, 828 (Tex.App.–Dallas 1992, writ denied)).
[48] *See D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 741 (Tex. 2009)).

To preclude coverage under the fortuity doctrine, an insured must have known of the loss or loss in progress before applying for the policy. Here, the Richies had prior knowledge of their own crimes and the likely claims that were reasonably expected to result from them. That knowledge should be imputed to Vantage, in this context, given the Richies' role with Vantage, their involvement with the losses, and Ms. Richies' participation. Thus, Vantage had the requisite knowledge to preclude coverage according to the fortuity doctrine.

Under Texas law, fortuity is a requirement of all insurance policies.[49] The fortuity doctrine precludes coverage for known losses and losses in progress.[50] A known loss is when the insured knows about the loss before entering the insurance contract.[51] "A 'loss in progress' occurs when the insured is, or should be, aware of an ongoing progressive loss at the time the policy is purchased."[52] Courts use an objective test to determine knowledge of a loss in progress. "The key inquiry is 'not whether the insureds actually knew of the underlying loss or potential liability, but rather whether they knew, at the inception of coverage that they were 'engaging in activities' which might reasonably be expected to expose them to or result in liability.'"[53] The fortuity doctrine is widespread and generally agreed upon in Texas.

The parties, of course, do not dispute the Richies' theft of millions of dollars from accounts that Vantage administered.[54] Significantly, the summary judgment evidence shows that, when Ms. Richie applied for the Policies on Vantage's behalf, she knew of the thefts, having participated in

---

[49] *Warrantech Corp. v. Steadfast Ins. Co.*, 210 S.W.2d 760, 766 (Tex.App.–Fort Worth 2006, pet. denied), (citing *Two Pesos, Inc. v. Gulf Ins. Co.*, 901 S.W.2d 495, 501 (Tex.App.–Houston [14th Dist.] 1995, no writ)).

[50] *See Scottsdale Ins. Co. v. Travis*, 68 S.W.3d 72, 75 (Tex. App.–Dallas 2001, pet. denied) *and BITCO Gen. Ins. Corp. v. Acadia Ins. Co.*, 427 F. Supp. 3d 838, 856 (E.D. Tex. 2019) (citing *Warrantech*, 210 S.W.3d at 766).

[51] *Id.*

[52] *Id.*

[53] *Wesco Ins. Co. v. Layton*, 725 Fed. Appx. 289, 293 (5th Cir. 2018) (quoting *RLI Ins. Co. v. Maxxon Southwest Inc.*, 108 Fed.Appx. 194, 199 (5th Cir. 2004)).

[54] *See* Pl. App. Ex. 30, pp. 308-322; Landmark App. Ex. F, pp. 124; *and* Landmark App. Ex. G, pp. 130.

their commission.[55] A reasonable person in the Richies' position would conclude that claims were the likely result of their crimes. And, of course, Ms. Richie failed to disclose the potential claims to Evanston and the Excess Policies carriers when she applied for the Policies on Vantage's behalf.

The Bankruptcy Trustee addresses fortuity by attempting to separate the Richies from Vantage. He argues that, if the Richies – and not Vantage – knew of the potential losses, then the fortuity doctrine is not triggered because only the insured's (*i.e.,* Vantage's) knowledge matters. The Bankruptcy Trustee relies on the Policies' definition of "Insured" which includes principals and employees in their capacities as such and ***when acting within the scope of their duties***.[56] Since stealing was not within the Richies' scope of duties, the Bankruptcy Trustee contends that they are not "Insureds." The Bankruptcy Trustee's position falls short because the Richies' ownership and control of Vantage makes them virtually inseparable from Vantage, in this context. The knowledge of one was imputed to the other.

The Bankruptcy Trustee relies on *Roman Catholic Diocese of Dallas, ex rel. Grahmann v. Interstate Fire & Cas. Co.*, 133 S.W.3d 887 (Tex. App.— Dallas 2004, pet. denied) to support the proposition that the Richies' knowledge of their own crimes and the potential claim was not imputed to Vantage. However, in *Grahmann*, the parties did not raise the fortuity doctrine. Additionally, the wrongdoer was a mere employee of the diocese rather than its principal and owner. This fact distinguishes *Grahmann* and highlights the more appropriate standard provided in *F.D.I.C. v. Ernst & Young*, 967 F.2d 166 (5th Cir. 1992).

---

[55] *See Id.*

[56] The Primary Policy describes the "Insured" as Vantage Benefits Administrators, Inc. and "[a]ny past or current principal, partner, officer, director, trustee or shareholder [and current employee] of [Vantage Benefits Administrators, Inc.] solely while acting on behalf of the Named Insured and within the scope of their duties as such." Evanston App. Ex. 15, pp. 214. The Excess Policies follow form.

In *F.D.I.C. v. Ernst & Young*, the Fifth Circuit concluded that a company had knowledge of the fraud that its owner and principal committed. In that case, the wrongdoer owned the company and acted as its Chief Executive Officer and Chief Operating Officer.[57] In its imputation analysis, the Fifth Circuit considered the principal's level of corporate responsibility:

> Because a corporation operates through individuals, the privity and knowledge of individuals at a certain level of responsibility must be deemed the privity and knowledge of the organization, "else it could always limit its liability." ... Where the level of responsibility begins must be discerned from the circumstances of each case.[58]

Here, the Richies were co-owners, officers, and directors of Vantage.[59] Mr. Richie served as the company's President and Chief Executive Officer, and Ms. Richie was its Vice-President of Administration.[60] Vantage had 52 other employees, but the Richies exercised enough control of Vantage to evade detection for at least three years.[61] Furthermore, to disentangle Vantage from its owners and principals here would disregard the level of responsibility the Fifth Circuit recognized in *F.D.I.C. v. Ernst & Young*. Ms. Richie herself completed and submitted the Policies' Applications and paperwork. For purposes of this coverage dispute, the Richies and Vantage should be deemed synonymous, so the court must consider the Richies' knowledge of the potential claim in its fortuity analysis. In summary, Vantage (not merely the Richies) had the requisite knowledge of the losses/claims to preclude coverage here.

> b) *The Insuring Agreement*

---

[57] *F.D.I.C. v. Ernst & Young*, 967 F.2d 166, 168 (5th Cir. 1992) (quoting *Continental Oil Co. v. Bonanza Corp.,* 706 F.2d 1365, 1376 (5th Cir.1983) and *Corvell v. Phipps,* 317 U.S. 406, 410-411 (1943)).

[58] *Id*. at 170.

[59] *See* Lloyd's App. Ex. 9, pp. 238.

[60] *See Id*.

[61] *See* Def. App. Exs. U, V, & W, pp. 155-69.

Under Texas law, the insured bears the burden to establish that a claim comes within the policy's insuring agreement.[62] If that burden is met, the insurer must establish that coverage is precluded by a policy exclusion.[63] Here, the undisputed evidence shows that the claims do not fall within the Policies' insuring agreement.

First, the claims did not arise from a "wrongful act," per the definition in the insuring agreement. Second, the Insureds' prior knowledge of the thefts does not satisfy Proviso b. which, like the fortuity doctrine, requires that facts giving rise to the claim be unknown for the Primary Policy to extend coverage. (To be clear, the Excess Policies, as follow-form policies, incorporate the Primary Policy's insuring agreement.)

The Primary Policy's insuring agreement states:

> The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount state in Item 5.A. of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to Section Claims A., Reporting Provision,
>
> By reason of:
>
> 1.    A Wrongful Act; or
>
> 2.    A Personal Injury;
>
> In the performance of Specified Professional Services rendered or that should have been rendered by the Insured or by any person for those Wrongful Act or Personal Injury the Insured is legally responsible,
>
> Provided:
>
>     …
>
> b)    Prior to the effective date of this Coverage Part the Insured had no knowledge of such Wrongful Act(s) or Personal Injury(ies) or any fact,

---

[62] *Gilbert Tex. Constr. L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010); *Guaranty Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998).
[63] *Id.*; Tex. Ins. Code §554.002.

circumstance, situation or incident, which may have led a reasonable
person in the Insured's position to conclude that a Claim was likely.[64]

First, the insuring agreement applies to claims arising from "wrongful acts." Significantly, the insuring agreement defines "wrongful act" as "a negligent act, error or omission in Specified Professional Services."[65] Intentional, criminal conduct is not a "negligent act, error or omission."[66] Here, the claims arose from the Richies' intentional conduct rather than mere negligence. The Factual Resume of Ms. Richie's Plea Agreement states that she "knowingly stole, embezzled and willfully converted to her own use and the use of others, money, funds, premiums, credits and assets…."[67] Similarly, the Factual Resume for Mr. Richie's Plea Agreement states that he "purposefully participated in the criminal venture."[68] Hence, the insuring agreement does not capture the claim resulting from their intentional, criminal conduct.

Second, Proviso b. ensures that the insuring agreement applies only to claims that the Insureds did not have knowledge of or had reason to expect. As discussed in greater detail above, the Richies' knowledge of their own thefts prior to the October 15, 2017 effective date of the Policies is undisputed.[69] Proviso b. imposes an objective test with respect to the question of whether facts or circumstances might be expected to lead to a claim covered by the insurance.[70] A reasonable person with the Richies' knowledge would conclude that a claim was likely.

 c) *The Exclusions*

---

[64] *See* Lloyd's App. Ex. 1, pp. 18; Pl. App. Ex. 15, pp. 216; *and* Landmark App. Ex. A, pp. 19.
[65] *See* Pl. App, Ex. 15, pp. 220 *and* Landmark App. Ex. A, pp. 23.
[66] *See Aspen Grove, Inc. v. Gulf Underwriters Ins. Co.*, No. 3:08-cv-1179-B, 2009 WL 10677475 (N.D. Tex. Aug. 21, 2009); *Illinois State Bar Ass'n Mut. Ins. Co. v. Cavenough,* 983 N.E.2d 468, 477 (Ill.App.Ct. 2012); *United States Fidelity & Guar'y Co. v. Fireman's Fund Ins. Co.*, 896 F.2d 200, 203 (6th Cir. 1990).
[67] *See* Lloyd's App. Ex. 10, pp 237. Landmark App. Ex. F, pp. 121-122 and 127.
[68] *See* Landmark App. Ex. G pp. 138-139.
[69] *See* Pl. App. Ex. 30, pp. 308-322; Landmark App. Ex. F, pp. 124; *and* Landmark App. Ex. G, pp. 130.
[70] *See, e.g.*, *American Int'l Specialty Lines Ins. Co. v. Continental Cas. Ins. Co.*, 142 Cal. App. 4th 1342, 1372-1373 (2006) (where the policy conditions coverage on the insured being unaware of "a circumstance that could reasonably be expected to lead to a" claim, the insured's subjective belief is irrelevant; the use of the word "reasonable" compels "an objective rather than a subjective analysis").

Even if the claims satisfied the requirements of the insuring agreement, the plain language of the Primary Policy's (and Excess Policies') exclusions preclude coverage. Specifically, the intentional and criminal nature of the Richies' conduct falls squarely within Exclusions J and P.

Exclusion J of the Primary Policy precludes coverage for any claim:

J.      Based upon, arising out of, or in any way involving:

1. Conduct of the Insured or at the Insured's direction that is intentional, willful, dishonest, fraudulent or that constitutes a willful violation of any statute or regulation; provided, however, this exclusion shall not apply to:

   a. The strictly vicarious liability of any Insured for the intentional, willful, dishonest or fraudulent conduct of another Insured or for the conduct of another Insured that constitutes a willful violation of any statute or regulation; or

   b. Claim Expenses incurred until an allegation is adjudicated through a finding by a trier-of-fact to be intentional, willful, dishonest or fraudulent or a willful violation of any statute or regulation; or

2. The gaining by any Insured of any profit, remuneration or advantage to which such Insured was not legally entitled; provided, however, this exclusion shall not apply to Claim Expenses incurred until an allegation is adjudicated through a finding by a trier-of-fact to be any profit, remuneration or advantage to which such Insured was not legally entitled; provided, that any fact pertaining to any Insured shall not be imputed to any other Insured under this Coverage Part for the purpose of determining the applicability of this exclusion;[71]

Exclusion P precludes coverage for any claim:

P.      Based upon or arising out of any conversion, misappropriation, commingling of or defalcation of funds, premiums, loss payments, fees, taxes commissions or any other monies, accounts, assets or property;[72]

---

[71] *See* Lloyd's App. Ex. 1, pp. 23.
[72] *See Id.*

Texas courts construe "arising out of" language broadly, requiring only "but for" causation.[73] As discussed above, the claims arose from the Richies' intentional criminal conduct. They include allegations of misappropriation, conversion, and theft.[74] This conduct directly caused the claim and falls squarely within the Primary Policy's exclusions.[75] Even if an adjudication were required to establish the application of these exclusions, default judgments exist against the Insureds in two civil lawsuits involving plan misappropriations: the *CPI* Federal Claim and the *Knight's* Claim.[76] The undisputed evidence shows that the exclusions encompass the conduct from which the claim arose.

For the reasons set forth above, the bankruptcy court believes that the Evanston MSJ and the Excess Policies MSJs should be granted, and the Trustee MSJ should be denied.

It is so RECOMMENDED.[77]


*** END OF REPORT AND RECOMMENDATION ***

---

[73] *Utica Nat'l Ins. Co. v. American Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004); *see also Companion Prop. & Cas. Co. v. Opheim*, 92 F. Supp. 3d 539, 549 (N.D. Tex. 2015) (quoting *Utica Nat'l*; *Willbros RPI, Inc. v. Continental Casualty Company*, 601 F.3d 306, 311 (5th Cir. 2010).

[74] *See* Pl. App. Exs. 1-5, pp. 5-157; Exs. 11-13, pp. 181-194.

[75] As noted by the Excess Policies carriers, there is something entirely different that Vantage should have had in place to insure against the Richies' theft: **an ERISA fidelity bond**, which is required under section 412 of ERISA, which would specifically insure a plan against losses due to fraud or dishonesty (*e.g.,* theft) on the part of persons (including, but not limited to, plan fiduciaries) who handle plan funds or other property. Landmark, App. Appendix Ex. E at 79; Lloyd's App. Ex. 13.

[76] *See* Pl. App. Ex. 8, pp. 168-169; Ex. 21, pp. 260-264; Ex. 24, pp. 270-272.

[77] As earlier mentioned, if the District Court adopts this Report and Recommendation, only the third-party claims that the Bankruptcy Trustee has asserted in this action against the insurance broker HWP will survive.